## NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILED**
**JANUARY 24, 2023**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| THE ESTATE OF CINDY ESSEX, by and through JUDY ESSEX, as Personal Representative of the ESTATE OF CINDY ESSEX, | ) ) ) ) | No. 37804-7-III (consolidated with No. 37994-9-III) |
| Petitioners, | ) ) | |
| v. | ) ) | |
| GRANT COUNTY PUBLIC HOSPITAL DISTRICT NO. 1, d/b/a SAMARITAN HEALTHCARE, a Public Hospital; and DR. IRENE W. CRUITE, M.D., and JOHN DOE CRUITE, husband and wife, and the marital community composed thereof, | ) ) ) ) ) ) ) | PUBLISHED OPINION |
| Respondents, | ) ) | |
| CONFLUENCE HEALTH, a Washington Corporation; WENATCHEE EMERGENCY PHYSICIANS, PC, a Washington Corporation; DR. CHRISTOPHER DAVIS, M.D., and JANE DOE DAVIS, husband and wife, and the marital community composed thereof; and JOHN and JANE DOES 1-10, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

LAWRENCE-BERREY, A.C.J. — The trial court certified multiple partial summary judgment orders in this medical malpractice case and we accepted review. We conclude: (1) ostensible agency is the sole basis for holding a hospital vicariously liable for the negligence of nonemployee physicians, (2) summary judgment was properly granted with respect to petitioners' corporate negligence claim against the hospital, and (3) summary judgment was improperly granted with respect to petitioners' negligence claims against the hospital's nurses and the radiologist. We affirm in part and reverse in part.

FACTS

On June 24, 2015, Cindy Essex visited Samaritan Healthcare's[1] emergency department in Moses Lake complaining of left shoulder pain. When Ms. Essex arrived at the emergency department, she was experiencing 10 out of 10 pain and abdominal cramping. She arrived at 2:13 p.m. and was triaged at 2:31 p.m. She was in too much pain to complete paperwork, so her mother completed it instead. At 2:36 p.m., she was taken to a quiet room to wait for the doctor to evaluate her. While waiting, the nurse applied ice to Ms. Essex's left shoulder, which Ms. Essex said helped the pain.

Dr. Christopher Davis arrived at 3:47 p.m. to assess Ms. Essex. She reported bloody diarrhea, vomiting, general abdominal pain, and said she had some blood in her

---

[1] Grant County Hospital District No. 1 doing business as Samaritan Healthcare.

2

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

stool.  She also reported increased aching left shoulder pain that was worse with

movement and palpation.  She said her children all had a fever and she thought she picked

up a virus from them.

Dr. Davis ordered two milligrams of intramuscular hydromorphone for pain, which

was administered to Ms. Essex at 3:56 p.m.  When reassessed at 4:40 p.m., her pain had

gone down to a 7 out of 10.  Because her symptoms extended from her shoulder to her

abdomen, Dr. Davis ordered x-rays of Ms. Essex's chest and abdomen to keep his

"diagnostic net fairly wide."  Clerk's Papers (CP) at 987.  The x-rays, as read by

radiologist Dr. Irene Cruite at 5:19 p.m., showed a "[n]onspecific paucity of gas in the

bowel loops with a large gastric air bubble."  CP at 523.

Based on the air bubble in Ms. Essex's stomach and the lack of air in her

intestines, Dr. Davis suspected Ms. Essex had a gastric outlet obstruction and ordered a

computed tomography (CT) scan of her abdomen and pelvis.  Around 5:30 p.m., Ms.

Essex's pain was 7 out of 10, and she received one milligram of intravenous

hydromorphone.  The report of her CT scan was completed at 6:20 p.m.  As interpreted

by Dr. Cruite, it showed a "[m]arkedly distended stomach with[ ] fluid, suspicious for

gastric outlet obstruction although no cause for obstruction is identified.  Placement of a

nasogastric tube for decompression . . . is recommended."  CP at 526.  At 6:56 p.m., a

3

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

nasogastric tube was inserted into Ms. Essex's stomach and 1.6 to 1.8 liters of clear green fluid was removed.

Because the CT scan did not identify a cause of Ms. Essex's gastric outlet obstruction, Dr. Davis consulted with a gastroenterologist, who recommended Ms. Essex be transferred for endoscopy. Dr. Davis spoke with Dr. Stephen Wiest at Central Washington Hospital in Wenatchee, who accepted Ms. Essex as a transfer. Dr. Davis ordered nonemergency ambulance transport and that Ms. Essex be given intravenous medication en route.

Shift change at Samaritan was at 7:00 p.m., and incoming nurse Zachary Hontz noted there was bruising on Ms. Essex's upper arms that was "small in nature." CP at 236. He noted Ms. Essex was sweating, her abdomen was distended, and she was complaining of lower back pain. He noted her temperature had not previously been charted, but measured it at 98.1 degrees.

Dr. Davis remained after his shift ended at 7:00 p.m. to complete paperwork. The last care he gave to her was at 7:25 p.m. Dr. Jonathan Kim came on shift at 7:00 p.m. but did not provide any care to Ms. Essex.

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

At 8:25 p.m., while waiting for transfer, Ms. Essex reported that her lower back pain was again a 10 out of 10. Nursing staff administered 0.5 milligrams of hydromorphone based on Dr. Davis's standing order to administer as needed.

At 8:35 p.m., the ambulance arrived to take Ms. Essex from Samaritan in Moses Lake to Central Washington Hospital in Wenatchee. Ms. Essex arrived at Central Washington Hospital at 10:10 p.m. She was very lethargic and had a high heart rate and low blood pressure. A nurse noted redness in Ms. Essex's left inner arm, breast, and chest area. She was given fluids and Dr. Wiest came to see her as soon as possible. The skin redness had darkened and there were new raised areas, which concerned Dr. Wiest as possibly indicating necrotizing fasciitis, a rapidly progressing soft-tissue infection. He ordered additional laboratory tests, which showed "severe elevations in her inflammatory markers." CP at 240. A CT scan at 1:11 a.m. revealed "[e]xtensive contusion or edema in the body wall . . . on the left." CP at 251. Dr. Wiest compared the CT scan to that taken at Samaritan and saw areas of inflammation in Ms. Essex's chest wall that were not noted in the CT report.

Dr. Wiest consulted with a surgeon, who agreed immediate debridement as a lifesaving measure was appropriate. In the 30 to 40 minutes it took the surgeon to arrive, Ms. Essex's skin redness had "rapidly" spread down to her groin. CP at 240-41. The

5

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

surgery revealed extensive areas of nonviable muscle, beyond anything the surgeon had

seen. The extent of necessary debridement was "not consistent with the survivable

condition." CP at 249. After surgery, Ms. Essex was moved to comfort care, and she

died later that morning.

PROCEDURE

*Essex's complaint*

Ms. Essex's estate (Essex) sued multiple entities for negligence, including

Samaritan Healthcare, Dr. Davis, and Dr. Cruite. The parties conducted extensive

discovery and brought a series of motions for partial summary judgment. The trial court

considered extensive briefing and arguments and made a number of rulings, which we

summarize below:

- A genuine issue of material fact precludes granting Essex's motion to hold Samaritan vicariously liable for the purported negligence of its nonemployee doctors, Dr. Davis and Dr. Cruite;
- Vicarious liability can be established based only upon ostensible authority; Washington has yet to recognize the theories of nondelegable duty or inherent authority;
- Lack of proximate cause precludes holding (1) Samaritan liable under a theory of corporate negligence, (2) Samaritan liable for the purported negligence of its nurses, and (3) Dr. Cruite liable for her purported negligence for not reporting inflammation in the chest area, visible on the CT scan.

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

The superior court certified its orders to this court under RAP 2.3(b)(4).  We

granted review on (1) whether a nondelegable duty exists for emergency room care in

Washington, and (2) whether, in the context of concurrent tortfeasors, expert testimony

can create a genuine issue of material fact as to what a subsequent tortfeasor would have

done had the prior tortfeasor not been negligent.  Comm'r's Ruling, *Estate of Essex v.*

*Grant County Pub. Dist. No. 1*, No. 37804-7-III (Wash. Ct. App. Aug. 19, 2021).

We later requested supplemental briefing on two issues that appeared to be raised

in one of the summary judgment motions: (1) whether Dr. Davis was an agent of

Samaritan for respondeat superior liability, and (2) whether Dr. Davis and Dr. Cruite were

jointly liable under the common law concerted action theory.

## ANALYSIS

### A.    SUMMARY JUDGMENT AND RECORD ON REVIEW

A party moving for summary judgment must show there is no genuine issue of

material fact and that they are entitled to judgment as a matter of law.  CR 56(c).  A

material fact is one on which the outcome of the litigation depends.  *Clements v.*

*Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993).  In deciding a motion

for summary judgment, the trial court views all facts and reasonable inferences therefrom

in the light most favorable to the nonmoving party.  *Id.*  We review an order on summary

7

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

judgment de novo, engaging in the same inquiry as the trial court based on the evidence and issues before it. *See McLaughlin v. Travelers Com. Ins. Co.*, 196 Wn.2d 631, 637, 476 P.3d 1032 (2020); RAP 9.12.

RAP 9.12 instructs that we consider only the evidence called to the attention of the trial court on review of a motion for summary judgment. But this is not the typical review of a summary judgment order. Here, the case is before us on interlocutory review at a point in the litigation where the trial court could revise its rulings. *See Hubbard v. Scroggin*, 68 Wn. App. 883, 887, 846 P.2d 580 (1993). We therefore consider the entire trial court record in our review of each and all of the certified orders.[2]

B.    SAMARITAN'S POTENTIAL VICARIOUS LIABILITY

Essex contends the trial court erred by limiting Samaritan's potential vicarious liability for the acts of Dr. Davis and Dr. Cruite to the theory of ostensible agency. We discuss the other theories posited by Essex below.

---

[2] During oral argument, we discussed the unusual procedural posture of these orders and questioned the parties whether we should review the entire record for each and all of the certified orders. They agreed we should. Wash. Court of Appeals oral argument, *Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*, No. 37804-7-III (Dec. 7, 2022), at 18 min., 19 sec. through 26 min., 51 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-3-court-of-appeals-2022121161/?eventID=2022121161.

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*


*Nondelegable duty*

Essex contends Samaritan has a nondelegable duty to provide emergency care that subjects it to vicarious liability for the actions of Dr. Davis and Dr. Cruite. We disagree.

The existence of a duty is a question of law we review de novo. *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984). In *Adamski v. Tacoma General Hospital*, 20 Wn. App. 98, 111 n.5, 579 P.2d 970 (1978), we suggested that Washington regulations arguably imposed on hospitals a nondelegable duty to provide emergency care services to the public. We discussed the relevant regulations in place at the time:

> The regulations require a licensed hospital to provide emergency care services in accordance with the community's needs and the hospital's capabilities. Within this general framework, however, the hospital is also required to adopt written policies and procedures specific to emergency care services. One requirement is that there must be a physician responsible for the services, whose functions and responsibilities are subject to the medical direction of the hospital.

*Id.* (emphasis omitted). While these regulations are no longer in place, Essex argues current regulations impose such a duty.

The Department of Health has authority to promulgate regulations to "establish and adopt such minimum standards and rules pertaining to the construction, maintenance, and operation of hospitals . . . particularly for the establishment and maintenance of standards of hospitalization required for the safe and adequate care and treatment of

9

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

patients." RCW 70.41.030. Pursuant to this authority, the Department of Health has adopted regulations requiring "hospital leaders" to "[p]rovide all patients access to safe and appropriate care." WAC 246-320-136(5). Leaders must "[a]dopt and implement policies and procedures which define standards of care for each specialty service" and "[p]rovide practitioner oversight for each specialty service" including emergency services. WAC 246-320-136(3), (4). Hospitals need not provide emergency services, but if they do, they must "[m]aintain the capacity to perform emergency triage and medical screening exam twenty-four hours per day; . . . [d]efine the qualifications and oversight of staff delivering emergency care services; . . . [and u]se hospital policies and procedures which define standards of care." WAC 246-320-281(2)-(4).

While a hospital must "[a]ssure emergency equipment, supplies and services necessary to meet the needs of patients are immediately available,"[3] the regulations no longer impose the requirement, identified in *Adamski*, that there be "physician responsible for the services, whose functions and responsibilities are subject to the medical direction of the hospital." 20 Wn. App. at 111 n.5. Instead, a hospital need only assure there is "at least one registered nurse skilled and trained in emergency care services on duty and in

---

[3] WAC 246-330-225(4).

10

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

the hospital at all times, who is: (a) [i]mmediately available to provide care; and

(b) [t]rained and current in advanced cardiac life support." WAC 246-320-281(5).

Unlike in *Adamski*, the current statutes and regulations do not create a duty to have

a physician provide medical care in an emergency department, let alone one subject to the

control of the hospital. We see no basis to hold Samaritan vicariously liable for the

actions of Dr. Davis and Dr. Cruite based on the duties identified in the statutes and

regulations.

*Inherent function*

Essex argues the court erred in denying its motion for summary judgment on the

basis that Dr. Davis and Dr. Cruite were performing an inherent function of the hospital.

We disagree.

Essex asserts that the *Adamski* court recognized that when a physician is

performing an inherent function of a hospital, the hospital is subject to vicarious liability

for the physician's actions. Samaritan disputes the court recognized such a duty. We thus

discuss the case in more detail.

In *Adamski*, a patient injured his finger while playing basketball and sought

treatment in the defendant's emergency room. 20 Wn. App. at 100. He experienced

complications with the wound and brought an action for damages against the emergency

11

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

room physician, Dr. Tsoi, the group of physicians to which Dr. Tsoi belonged and that

contracted with the hospital for its emergency department staffing and the hospital. *Id.* at

102. The patient alleged that the hospital was liable in part because Dr. Tsoi was acting

as its agent. *Id.* The trial court granted summary judgment in favor of the hospital,

concluding Dr. Tsoi was an independent contractor rather than an employee of the

hospital. *Id.* at 103.

On appeal, the court extensively discussed principles of agency in the context of a

hospital's relationship with its nonemployee doctors. We noted that applying the

traditional right to control test to this relationship "usually leads to unrealistic and

unsatisfactory results, at least from the standpoint of the injured patient." *Id.* at 105. We

proceeded to discuss various approaches to hospital liability that other courts had

developed. In rejecting its prior theory of hospital immunity, the New York Court of

Appeals had reasoned:

> "The conception that the hospital does not undertake to treat the
> patient, does not undertake to act through its doctors and nurses, but
> undertakes instead simply to procure them to act upon their own
> responsibility, no longer reflects the fact. Present-day hospitals, as their
> manner of operation plainly demonstrates, do far more than furnish
> facilities for treatment. They regularly employ on a salary basis a large staff
> of physicians, nurses and internes, as well as administrative and manual
> workers, and they charge patients for medical care and treatment, collecting
> for such services, if necessary, by legal action. Certainly, the person who
> avails himself of 'hospital facilities' expects that the hospital will attempt to

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

cure him, not that its nurses or other employees will act on their own responsibility."

*Id.* at 106 (emphasis omitted) (quoting *Bing v. Thunig*, 2 N.Y.2d 656, 666, 143 N.E.2d 3, 163 N.Y.S.2d 3 (1957)).

The *Adamski* court discussed how California had developed the *Brown* test, which applied if the patient sought treatment primarily from the hospital (rather than the doctor) and if the hospital paid the doctor a salary (rather than the doctor billing the patient). *Id.* at 107 (citing *Brown v. La Societe Francaise de Bienfaisance Mutuelle*, 138 Cal. 475, 71 P. 516 (1903)). We noted that other courts moved to a "significant relationship" approach, looking at whether, in light of all the facts and circumstances, the relationship between the physician and the hospital was significant enough that the rule of respondeat superior should apply. *Id.* at 108. Under that approach, when a hospital chooses to "provide medical treatment rather than merely serving as a place for a private physician to administer to his patients, the physician employed to deliver that service for the hospital may be looked upon as an integral part of the total 'hospital enterprise.'" *Id.* We viewed this as a "more enlightened approach" to determining respondeat superior liability. *Id.*

In analyzing Dr. Tsoi's agency for the purpose of the hospital's respondeat superior liability, the *Adamski* court first applied the *Brown* test, finding the first prong satisfied because the patient went directly to the emergency room and did not choose his

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

doctor. *Id.* at 111-12. The second prong, however, failed because Dr. Tsoi's physician group billed patients for its professional services rather than receiving a salary from the hospital. *Id.* at 112.

The *Adamski* court then applied the "significant relationship" approach and noted there was substantial evidence that Dr. Tsoi was performing an inherent function of the hospital, "*i.e.*, he was an integral part of the total hospital function or enterprise." *Id*. It concluded that "when one considers all the facts and circumstances of the relationship" between the hospital and Dr. Tsoi, "a substantial and genuine issue arises as to whether that relationship is that of principal and agent." *Id.* It thus concluded that the trial court erred in granting summary judgment for the hospital on the issue of Dr. Tsoi's agency. *Id.*

The *Adamski* court then proceeded to discuss ostensible agency as an alternate basis of liability, concluding that there was a genuine issue of material fact as to whether the hospital "held out" Dr. Tsoi as providing emergency care on behalf of the hospital. *Id*. at 115-16. It remanded for further proceedings on both grounds of agency liability. *Id.* at 117.

Based on our review of *Adamski*, we disagree that the court adopted a new "inherent function" test for vicarious liability. Rather, the court discussed inherent

14

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

function as a factor, among others, in determining whether the parties had a significant relationship such that respondeat superior liability should apply. *See* RESTATEMENT (SECOND) OF AGENCY § 220 (AM. LAW INST. 1958). We find no support for inherent function as an independent theory for establishing vicarious liability. We conclude the trial court did not err in rejecting such a theory.

### *Functional equivalent*

In a statement of additional authorities, Essex noted that our Supreme Court recently recognized that nonemployee physicians are the "functional equivalent" of the hospital's employees for purposes of permitting the hospital's attorney to have ex parte communication with them. *Hermanson v. MultiCare Health Sys., Inc.*, 196 Wn.2d 578, 589-90, 475 P.3d 484 (2020). There, the divided court noted, "Whether there is vicarious liability between two defendants is separate from whether such parties may have ex parte communications with one another under evidentiary privilege." *Id.* at 590. To its credit, Essex noted this distinction, but urges us to adopt a rule based on what we think our Supreme Court would do should this issue come before it.

We think our Supreme Court would reject imposing vicarious liability based on the notion of functional equivalency. First, three dissenting justices wanted to preserve the distinction between the nonemployee physician and the hospital. *Hermanson*, 196

15

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

Wn.2d at 594 (Stephens, C.J, concurring in part, dissenting in part). And of the six justices in the majority, the inclusion of the quoted language shows that some wanted to preserve the distinction for purposes of imposing vicarious liability.

Also, policy is best affected by the legislature. *In re Guardianship of Hamlin*, 102 Wn.2d 810, 821-22, 689 P.2d 1372 (1984). This is especially true in areas such as health care and medical negligence where the legislature has set policy through statutes and regulations promulgated by legislative authority. *See*, *e.g.*, Title 70 RCW, chapter 7.70 RCW, Title 246 WAC. It appears our legislature has chosen to limit a hospital's vicarious liability to its officers, directors, employees, and agents. *See* RCW 7.70.020(3) (for injuries resulting from health care, defining "health care provider" as a nonexclusive list of entities, including a hospital, together with their "officer[s], director[s], employee[s], or agent[s]" acting within their scope of employment). We see nothing in the statutes or regulations that support imposing vicarious liability against a hospital for nonemployee doctors.

### *Acting in concert*

In its motion for summary judgment, Essex argued that Samaritan was liable for the negligence of Dr. Davis and Dr. Cruite because they were acting in concert under RCW 4.22.070(1)(a). In our de novo review of the record, we requested supplemental

16

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

briefing on whether the common law theory of concerted action was applicable to Dr.

Davis and Dr. Cruite. We conclude it is not.

Concerted action under the common law derives from vicarious liability and

requires that a plaintiff show "a tacit agreement among defendants to perform a tortious

act." *Martin v. Abbott Lab'ys*, 102 Wn.2d 581, 596, 689 P.2d 368 (1984). A defendant

can be liable for harm resulting from another person's tortious act if he "'gives

substantial assistance to the other in accomplishing a tortious result and his own conduct,

separately considered, constitutes a breach of duty to the third person.'" *Id.* (quoting

RESTATEMENT (SECOND) OF TORTS § 876(c), at 315 (AM. LAW INST. 1977)). Under this

theory, a defendant need not know that his act or the other's is tortious. *Id.* at cmt. e.

RCW 4.22.070(1)(a) provides an exception to Washington's default proportionate

liability, making a party "responsible for the fault of another person or for payment of the

proportionate share of another party where both were acting in concert . . . ." The

provision was enacted as part of the "Tort Reform Act of 1986." *See* LAWS OF 1986,

ch. 305, § 401. We previously discussed the impact of the Tort Reform Act on the

common law theory of concerted action, concluding it intended to restore a "'strict and

narrow understanding of concerted action.'" *Gilbert H. Moen Co. v. Island Steel*

*Erectors, Inc.*, 75 Wn. App. 480, 486, 878 P.2d 1246 (1994), *rev'd on other grounds*,

17

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

128 Wn.2d 745, 912 P.2d 472 (1996) (quoting Gregory C. Sisk, *Interpretation of the*

*Statutory Modification of Joint and Several Liability: Resisting the Deconstruction of*

*Tort Reform*, 16 U. PUGET SOUND L. REV. 1, at 105 (1992)).

> Under this narrow interpretation:
>
> "Cooperation in a lawful enterprise, which results in harm to a third person
> through negligence, does not rise to the high level of concerted activity.
> Participation in a legitimate commercial relationship does not constitute
> acting in concert, even if a third person is harmed by the actions of one of
> the parties[.]"

*Id.* (emphasis omitted) (alteration in original) (quoting Sisk, *supra* at 107). Our Supreme

Court later adopted the *Moen* court's analysis and its definition of acting in concert for

the purpose of RCW 4.22.070(1)(a) as "'consciously act[ing] together in an unlawful

manner.'" *Kottler v. State*, 136 Wn.2d 437, 448, 963 P.2d 834 (1998) (quoting *Moen*,

75 Wn. App. at 487).

Here, there is no evidence that Dr. Davis, Dr. Cruite, and Samaritan intended to

act in an unlawful manner. The trial court correctly denied Essex's motion to hold

Samaritan vicariously liable under RCW 4.22.070(1)(a) for the purported negligence of

Dr. Davis and Dr. Cruite.

18

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

     C.      PROXIMATE CAUSE

Essex contends the trial court erred by dismissing various negligence claims for lack of proximate cause. We agree in part.

On summary judgment, a defendant may demonstrate there is no genuine issue of material fact for trial by showing that the plaintiff has failed to prove an essential element of their claim. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial', then the trial court should grant the motion." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

In a medical malpractice action, a plaintiff must prove "duty, breach, injury, and proximate cause." *Mohr v. Grantham*, 172 Wn.2d 844, 850, 262 P.3d 490 (2011) (citing RCW 7.70.040). Proximate cause generally requires a showing that the breach of duty was a cause in fact of the injury and a showing that liability should attach as a matter of law. *Id.* We now examine the three negligence claims dismissed by the trial court following its conclusion that Essex could not establish proximate cause.

19

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

*Corporate negligence claim*

Essex contends the trial court erred in dismissing its claim that Samaritan could be liable for corporate negligence. We disagree.

Essex's theory of corporate negligence was that Samaritan was required to have policies in place with respect to recognizing infectious disease, to adequately train its nurses in those policies, and to have adequate oversight of its nurses engaged in triage.

Dr. Amy Curley identified deficiencies in Samaritan's policies regarding ongoing training and identification of infectious diseases and its oversight, opining that nursing staff should have brought Ms. Essex's symptoms to Dr. Davis's attention sooner. However, Dr. Thomas Cumbo acknowledged that when Dr. Davis evaluated Ms. Essex, he had all the relevant information. Even with that relevant information, Dr. Davis diagnosed gastric outlet obstruction, not necrotizing fasciitis.[4] Any failure by Samaritan in regard to its triage policies, training, and oversight did not proximately cause Dr. Davis's failure to diagnose necrotizing fasciitis.

---

[4] Indeed, given that Ms. Essex's symptoms became more severe over time, it seems likely that if Dr. Davis had examined her earlier, he would have been even less likely to diagnose necrotizing fasciitis.

20

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

Dr. Cumbo also identified the nurses' failure to notify Dr. Davis that Ms. Essex's pain had returned as falling below the standard of care.[5] However, he did not link that failure to any failure in Samaritan's policies, training, or oversight. To the contrary, he stated he was sure the nurses had training in what abnormal vital signs were. While this testimony may establish that the nurses breached their standard of care, it does not support Essex's claim of corporate negligence. We conclude the trial court did not err when it dismissed Essex's corporate negligence claim.[6]

### *Dr. Cruite's negligence*

Essex contends the trial court erred in dismissing its negligence claim against Dr. Cruite for lack of proximate cause. We agree.

---

[5] Samaritan argued below and argues on appeal that Dr. Davis was aware of how Ms. Essex was responding to pain because he noted she felt better after her first intravenous dose of hydromorphone and the removal of almost two liters of liquid from her stomach. This does not address whether Dr. Davis knew that Ms. Essex's pain returned to and stayed at a 10 out of 10 while awaiting transport to Wenatchee, despite a second intravenous dose of hydromorphone.

Samaritan argued below that Dr. Davis ordered the administration of intravenous hydromorphone because he realized the initial intramuscular hydromorphone did not relieve her pain. This is contradicted by the record. Dr. Davis testified he ordered the administration of an initial intramuscular dose only because an intravenous line had not yet been placed.

[6] Samaritan urges us to hold that Washington does not recognize Essex's theory of corporate negligence. Because we have resolved Essex's claim on other grounds, we elect not to decide whether Washington recognizes such a theory.

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

Before we discuss the law, we set forth the relevant evidentiary facts. The parties disputed whether Dr. Cruite's failure to identify the abnormality in the left chest wall altered the course of Dr. Davis's treatment. They focused on deposition testimony from Dr. Davis.

> Q.[7] . . . If the radiologist had said, "Yeah, we've got some stuff going on up here in the chest wall, too," would that have changed your position with regard to how you handled this patient?
> . . . .
> [Dr. Davis]. Hypothetically, I could say that it probably would have. It would not have changed my diagnosis of gastric outlet obstruction because that was still independently and clinically present, but it would have alerted me that there were additional findings that were not consistent with that single diagnosis explaining her entire complaint and it would have prompted me to do other things.

CP at 1053-54. He further testified that he reviewed the CT scan the following morning after Ms. Essex had been transferred to Central Washington Hospital and diagnosed with necrotizing fasciitis, and "[i]n hindsight" there was "obvious" inflammation in Ms. Essex's chest wall. CP at 2048-49. "That inflammation was also nonspecific, but it was there." CP at 2049. He had previously considered necrotizing fasciitis in his differential diagnosis, but ruled it out in part because all of Ms. Essex's symptoms were explained by a gastric outlet obstruction.

---

[7] The speaker is not identified in the excerpt, but from context appears to be Essex's attorney, William Gilbert.

22

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

Dr. Kevin Hanson testified that emergency department physicians rely on radiologists to read CT scans, although they may pull up the scan based on interest. Dr. Charles Pilcher opined that the standard of care would require an emergency room doctor to explore abnormalities reported in imaging studies. Had Dr. Cruite reported the soft tissue abnormalities in Ms. Essex's chest wall, Ms. Essex's "course of care would have been altered" and the necrotizing fasciitis would have been discovered through a surgical consult. CP at 1748.

Dr. Cumbo testified that the standard of care for a surgical consult for necrotizing fasciitis is 30 to 60 minutes and debridement should happen as soon as possible and could have happened at Samaritan.

The parties' arguments below and on discretionary review have centered on two Washington cases. We begin by discussing those cases.

In *Douglas v. Bussabarger*, 73 Wn.2d 476, 477, 438 P.2d 829 (1968), a patient was harmed by the anesthetic used during surgery and sued the surgeon and the drug manufacturer. After a jury returned a verdict in favor of the defendants, the patient appealed, and our Supreme Court affirmed as to the drug company. *Id.* at 491. It noted that the patient's only issue was whether the drug company should have warned of possible dangers of the drug on its label, but the surgeon testified at trial "that he relied on

23

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

his own knowledge of anesthetics and, in fact, did not read the labeling which was on the container." *Id.* at 478. The court concluded that even if the drug company was negligent for failing to warn of dangers on the drug's label, "this negligence was not a proximate cause of plaintiff's disability." *Id.*

We followed *Douglas* in *Sherman v. Pfizer, Inc.*, 8 Wn. App. 2d 686, 698-99, 440 P.3d 1016 (2019), another case involving a drug manufacturer's failure to warn. There, a patient developed a movement disorder after taking medication produced by the defendant drug companies. *Id.* at 691-92. She brought a products liability claim against the drug companies, alleging they should have updated their package insert to warn against extended use of the medication. *Id.* at 689. The prescribing doctor, however, testified that he did not read package inserts and had never read a package insert for the medication. *Id.* at 693. The court reasoned that the patient had introduced no evidence to create a genuine issue of material fact regarding whether the doctor had read the package inserts and thus, as a matter of law, the failure to update the inserts could not have proximately caused the patient's harm. *Id.* at 699.

The principle identified in *Douglas* and *Sherman* relates to the basic and longstanding "but for" test of cause in fact. The patients were required to prove that they would not have been harmed by the medication but for the failure to warn. They could

24

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

not do so because the doctors would have used the medications regardless of inadequate

warnings. The "but for" test is applicable in most cases, including most medical

malpractice cases.[8] *Dunnington v. Virginia Mason Med. Ctr.*, 187 Wn.2d 629, 636, 389

P.3d 498 (2017). Thus, had Dr. Davis testified he would not have considered necrotizing

fasciitis even had Dr. Cruite reported inflammation in Ms. Essex's chest wall, this would

break the causal chain between Dr. Cruite's failure to report the existing inflammation

and Ms. Essex's harm.

As identified by the *Sherman* court, Essex had to establish that Dr. Davis, himself,

would have considered necrotizing fasciitis had Dr. Cruite reported the existing

inflammation.[9] Dr. Davis testified that had the CT results disclosed the existing

---

[8] Essex argues these cases are not applicable outside the drug manufacturer failure to warn context, contending that the *Sherman* court "expressly based its discussion of proximate cause on the learned intermediary doctrine." Pet'rs' Reply Br. at 33. This is incorrect. The *Sherman* court based its discussion of duty on the learned intermediary doctrine. 8 Wn. App. 2d at 695. The learned intermediary doctrine defines a drug manufacturer's duty to warn, limiting it to the prescribing doctor rather than the end user. *Dearinger v. Eli Lilly & Co.*, 199 Wn.2d 569, 574, 510 P.3d 326 (2022). It does not alter the rules of causation; rather, it "has bearing only on who a manufacturer must warn." *Id.* at 585 (emphasis omitted).

[9] The parties disagree on whether expert testimony on this subject is relevant. Because this issue is likely to arise at trial, we offer the following comments.

One may presume that Dr. Davis, a trained emergency room doctor, would act in a reasonably prudent manner. As long as the trier of fact understands that expert testimony on this subject is being admitted for the limited purpose of showing what Dr. Davis would have done, it is relevant and admissible, subject to an ER 403 analysis by the trial court.

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

inflammation in the chest wall, he would have investigated further because his diagnosis of gastric outlet obstruction would not explain the inflammation.[10]  He did not testify he would have correctly diagnosed necrotizing fasciitis had Dr. Cruite reported inflammation, but this is not fatal to Essex's claim.  But Dr. Pilcher testified that Dr. Davis more likely than not would have diagnosed necrotizing fasciitis had Dr. Cruite reported the existing inflammation.  This testimony achieves the same purpose.

Still, Essex must establish more to present a triable issue that Dr. Cruite's negligence proximately caused harm.  In addition to evidence that Dr. Davis likely would have diagnosed necrotizing fasciitis, Essex also must establish that a surgeon was likely available to timely operate on Ms. Essex.  Essex satisfied this burden.  Dr. Cumbo testified that a surgical consult would likely have been available between 30 and 60 minutes and could have happened at Samaritan.  This is sufficient to establish a prima facie case of proximate cause.

---

[10] Dr. Cruite argues at length that Dr. Davis unequivocally testified he would not have changed his diagnosis.  The relevant inquiry is not whether Dr. Davis would have changed his diagnosis of gastric outlet obstruction, but rather whether he would have *additionally* diagnosed necrotizing fasciitis.

26

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

The crucial distinction between this case and *Douglas* and *Sherman* is that there, the doctors' testimony cut off the chain of causation and so the drug companies' failure to warn was not a cause in fact of the patients' injuries. Here, viewing the facts in the light most favorable to Essex, Dr. Davis would have continued investigating Ms. Essex's symptoms, diagnosed necrotizing fasciitis, and initiated successful surgery but for Dr. Cruite's alleged failure to identify inflammation in the CT scan. We conclude the trial court erred in dismissing Essex's negligence claim against Dr. Cruite.

*Samaritan's liability for its nurses*

Essex contends the trial court erred in dismissing its negligence claim against Samaritan's nurses for lack of proximate cause. We agree.

As discussed above, in relation to corporate negligence, Essex could not prove that any breach of the standard of care on the part of the nurses *before* Dr. Davis's diagnosis of gastric outlet obstruction proximately caused Ms. Essex's death. However, Dr. Cumbo also identified as a breach of the standard of care the nurses' failure to inform Dr. Davis that Ms. Essex's pain returned while she waited for transfer. Dr. Pilcher stated that based on Ms. Essex's changes after 7:00 p.m., the standard of care required a doctor to reassess her and that a physical exam and reassessment after 7:00 p.m. would have identified necrotizing fasciitis. Dr. Davis himself testified he would have continued trying to

27

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

diagnose Ms. Essex's condition if he was aware she had symptoms not entirely explained by gastric outlet obstruction.

Samaritan argued at summary judgment that it was unrefuted that Dr. Davis had all the information the nurses had. This is not so. As noted above, Dr. Davis was aware that Ms. Essex's pain was not immediately relieved by painkillers and that she improved after additional medication and stomach decompression. But this does not answer whether he knew her pain returned to 10 out of 10 while awaiting transport. Although the nurses charted Ms. Essex's vital signs and symptoms, there is no evidence that Dr. Davis referred to her chart contemporaneously such that he was aware of her deteriorating condition while awaiting transport. This creates a genuine issue of material fact as to whether Dr. Davis had all the information the nurses had. Had Dr. Davis known of the existing inflammation *and* the return of Ms. Essex's horrendous pain following decompression, this would have presented another opportunity for the doctor "to do other things." CP at 1054. We conclude the trial court erred in dismissing Essex's negligence claim against Samaritan's nurses.

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37804-7-III; No. 37994-9-III
*Estate of Essex v. Grant County Pub. Hosp. Dist. No. 1*

Affirmed in part, reversed in part.

_____
Lawrence-Berrey, A.C.J.

WE CONCUR:

_____
Pennell, J.

_____
Staab, J.

29